265 N.J. Super. 418 (1993)
627 A.2d 691
GAIL MARX, PLAINTIFF,
v.
JOHN MARX, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Sussex County.
Decided March 26, 1993.
*419 Francis G. Grather for plaintiff (Broderick, Newmark & Grather, attorneys)
George Daggett for defendant (Daggett & Kraemer, attorneys)
PARKER, J.S.C.
This matter comes before the court on a post-judgment motion to settle the form of qualified domestic relations order (QDRO) to be entered pursuant to the parties' interspousal agreement. Specifically, plaintiff seeks to have the court determine her rightful interest in defendant's American Airlines Pilot Pension Plan. The facts are undisputed in this case. The sole issue to be determined by the court is the method of distributing defendant's fixed income plan.

FACTS
Plaintiff and defendant were married on July 30, 1966. The complaint for divorce was filed on February 6, 1987. On July 29, 1991, after one day of trial, the case settled with an agreement on the record. The agreement was reduced to writing and signed by the parties on April 25, 1991. The judgment of divorce was entered on April 26, 1991.
There were three major assets to be distributed: the marital home, cash and defendant's American Airlines Pilot Pension Plan. In accordance with the agreement, plaintiff deeded the marital home to defendant in return for a cash payment. Under Section IV of the agreement, the pension was to be distributed as follows:
1. The husband and wife agreed to consent to a QUDRO [sic] order providing for the payment to the wife of 50% of the entire pension plan of the husband with American Airlines. The said pension plan is divided into Plan A and Plan B and the husband agrees that the wife shall receive 50% of each plan for that period of time commencing on the date of the marriage (July 30, 1966) to the date of the filing of the complaint for divorce (March 6, 1987).

*420 A. The wife shall be entitled to any post-retirement cost of living increases on Plan A for the time period indicated above.
B. The wife's entitlement to Plan A will continue for her lifetime.
C. The wife shall be entitled to any passive gain on her share of Plan B accruing after March 6, 1987.
Defendant entered the American Airlines Pilot Pension Plan on July 1, 1967 and anticipates retirement on July 1, 2000 at age 60.
In July 1991, plaintiff's counsel forwarded to defendant's counsel two proposed forms of QDROs, one for each plan. In the orders, Plan A is described as a "Fixed Income Plan" and Plan B as a "Variable Income Plan".
Defendant responded to plaintiff's proposed QDROs in December 1991 and apparently objected to the fixed income plan order, although he did not specify which order he was objecting to. On December 30, 1991, plaintiff replied, explaining the difference between the two orders and why they should be entered as proposed. Defendant still did not consent to the proposed QDROs but on May 27, 1992, again objected to the form of order stating that the fixed income plan should be segregated into two separate accounts. Defendant did not, however, provide an alternative form of order to be considered by plaintiff, nor did he provide any legal basis for his position.
Finally, on September 4, 1992, plaintiff filed a motion to have the court determine whether her proposed QDROs should be entered. In his response to the motion, defendant stated that he did not object to the variable income plan order; he objected only to the fixed income plan order.
The court heard oral argument on the motion and, thereafter, plaintiff requested the opportunity to submit a supplemental certification of William Troyan, the expert she had retained to evaluate the pension plans and assist in drafting the QDROs. On November 10, 1992, the court entered an order providing a time table within which defendant was to submit his proposed form of order and for the parties to make additional submissions, after which the court would render a decision. Herein is the court's decision.

*421 THE PENSION PLAN

The pension plan referred to in the Agreement, consists of two separate and distinct plans. Plan A, a fixed income plan, is an aggregate funded qualified "defined benefit plan" described under the Internal Revenue Code, 26 U.S.C. § 414(j):
(j) Defined Benefit Plan. For the purposes of this part [26 U.S.C.S. §§ 401, et seq.] the term `defined benefit plan' means any plan which is not a defined contribution plan.
Plan B, a variable income plan, is a qualified "defined contribution plan" described under the Internal Revenue Code, 26 U.S.C. § 414(i):
(i) Defined Contribution Plan. For the purposes of this part [26 U.S.C.S. §§ 401 et seq.] the term `defined contribution plan' means a plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.
The distinction between the two plans is that under Plan B, the defined contribution plan is funded by employee contributions, an individual account is maintained for each employee and the employee's benefits are based solely upon the employee's contributions to the plan, plus gain or loss on those contributions. Under Plan A, the defined benefit plan is funded entirely by contributions of the employer and the employee's benefit is calculated at the time of retirement based upon a number of factors which may include the employee's age at the time of retirement, the employee's final salary, the number of years of employment, mortality, future rates of interest and the form in which the annuity is paid. The defined benefit plan consists of an aggregate fund for all employees. There are no individual accounts for each employee.
In plaintiff's proposed form of QDRO for Plan B, the defined contribution plan, defendant's individual account is to be segregated into separate accounts for plaintiff and defendant. Plaintiff's account is fixed at 50% of the value of the plan as of February 6, 1987 and will increase only by the interest accrued on that account. Defendant will continue to make contributions to his *422 account and it will increase in value accordingly. The parties do not dispute that formulation for the distribution of Plan B. The focus of this motion is on the distribution of Plan A.

THE PARTIES' CONTENTIONS
Plaintiff contends that her share of Plan A, the defined benefit plan, can only be calculated at the time of defendant's retirement when a coverture fraction[1] will be applied to the total accrued benefit. The amount derived from the coverture fraction will then be multiplied by plaintiff's equitable share of the pension, in this case 50%.
Defendant's contention, however, is not quite so clear. In his certification in opposition to the motion, defendant states that the QDRO for distribution of the defined benefit plan should be similar to that of the defined contribution plan, in that the amount of the plan fund attributable to defendant, as of the date of filing the complaint, should be segregated into two separate accounts. Plaintiff's account should be fixed at the amount on the date of the complaint and increased only by the interest accrued on her account until it is payable on defendant's retirement.
At oral argument, however, defendant's counsel departed from that position when he stated, "The problem with the fixed income [defined benefit] plan is you can't allocate a separate account because John Marx doesn't have a separate account." Later in oral argument, defendant's counsel indicated that the coverture fraction should be applied. In his form of QDRO submitted after oral argument, however, defendant proposed the following distribution of the defined benefit plan:
The total accrued benefit of the Alternate Payee [plaintiff] shall be determined by the Plan Administrator as follows:

*423 A. Fifty percent (50%) of the total accrued benefit of the participant as of the cutoff date established herein as February 6, 1987, together with the interest on that 50% up until the time the alternate payee moves her interest to pay status.
B. At such time when the Alternate Payee moves her interest to pay status, her share, as determined by A above shall be adjusted to include any gain which that share would earn exclusive of the 4% per year, or other contribution made by the participant after February 6, 1987.
Defendant's proposed form of order is unclear in that it indicates that contributions made by "the participant" should be excluded after the February 6, 1987 cutoff date. A "participant" in a defined benefit plan is an employee who is eligible to share in the plan's benefits. 26 U.S.C. § 410. The defined benefit plan, however, does not provide for contributions by the "participant". Rather, all contributions are made by the employer. Moreover, defendant's proposed form of order makes no reference to the coverture fraction that defendant's attorney contended at oral argument should be applied.
Plaintiff's expert, William M. Troyan, submitted two certifications in support of plaintiff's motion. Initially, the court notes that Mr. Troyan's credentials in the field of pension evaluations are extensive. Mr. Troyan was certified by the American Compensation Association after passing seven four-hour examinations in the fields of mathematics, statistics, defined benefit plans, defined contribution plans, contribution analysis and other topics relating to employee benefits. He has lectured in the field of pension evaluation and has been qualified as an expert witness approximately 80 times in the State of New Jersey and 130 times in other states. Mr. Troyan was cited as an authority on pension evaluations in Whitfield v. Whitfield, 222 N.J. Super. 36, 51, 535 A.2d 986 (App.Div. 1987).
In his initial certification, Mr. Troyan points out that defendant's first proposal to establish two separate accounts in the defined benefit plan is not possible under the Internal Revenue Code. The defined benefit plan is an aggregate account of funds contributed by the employer for the benefit of all participating employees. There are no individual accounts for each employee and there is no fixed amount attributable to the employee which *424 can be segregated into separate accounts for plaintiff and defendant. An employee's retirement benefits can only be determined by a formula applied at the time of retirement.
Defendant submitted a statement from American Airlines indicating that his basic accumulation account for the defined benefit plan amounted to $55,595.78 on December 31, 1986. Defendant contends that this is the present value of the plan as of that date and argues that plaintiff is entitled to 50% of that amount plus whatever interest her share earns until the date of his retirement.
In Mr. Troyan's supplemental certification, he opined that the basic accumulation account cannot be used to determine the present value of the defined benefit plan. The present value of a defined benefit plan must be determined in the aggregate pursuant to the minimum funding standards found in the Internal Revenue Code, 26 U.S.C. § 412. As Mr. Troyan stated in his certification:
Under a defined benefit plan, the basic benefit is an annuity paid at the time of retirement and takes into account age at retirement, the final average salary of the employee, the number of years of credited services, mortality, future rates of interest and the form in which the annuity is paid. .. . Thus, there is no one single factor which determines the value of the benefit in this plan.
Troyan, certification ¶ 7.
The American Airlines Employee Handbook (August 1988), submitted by plaintiff states that the basic accumulation account represents only the amount contributed by the employer plus the interest thereon. The basic accumulation account is the benefit paid to an employee who dies or terminates employment before retirement. The basic accumulation account does not reflect the benefit payable on retirement because that benefit can be calculated only at the time of retirement based upon the multiple factors of age at retirement, final average salary, number of years of services, mortality, future interest rates and the form in which it is paid. The retirement benefit is not calculated on the employer's contributions. Thus, the amount in the basic accumulation account as of December 31, 1986, cannot be utilized to determine the *425 present value of the defined benefit plan for the purpose of allocating the plan benefits in equitable distribution.
Similarly, defendant's proposed QDRO provides no method by which the plan administrator can calculate the retirement benefit as of February 6, 1987, because the retirement benefit can only be calculated at the date of retirement based upon factors applicable on that date.
Defendant provided no expert witness of his own nor did he refute Mr. Troyan's opinion as to the application of the Internal Revenue Code to the distribution of the defined benefit plan. Moreover, defendant has cited no statutory or case law to support his position.

DISCUSSION
Under New Jersey law, pensions are clearly subject to equitable distribution. Kruger v. Kruger, 73 N.J. 464, 375 A.2d 659 (1977). It is well established that the "right to receive benefits accruing to a spouse subsequent to a divorce are subject to equitable distribution if they are related to the joint efforts of the parties." Moore v. Moore, 114 N.J. 147, 154, 553 A.2d 20 (1989); Whitfield v. Whitfield, 222 N.J. Super. 36, 535 A.2d 986 (App.Div. 1987). In Whitfield, the parties had been married for 16 years, during all of which the husband was in military service. His pension would not vest until after 20 years of service. The husband argued that the pension should be excluded from the marital estate because it did not mature during the marriage.
The Appellate Division held that the pension was, indeed, subject to equitable distribution to the extent of the employee's participation in the pension plan during the marriage. The method of distribution prescribed by the court involves the application of the coverture fraction multiplied by the non-employee spouse's share. The coverture fraction is determined as follows: "The numerator of the fraction is the period of pension plan participation during the marriage and the denominator is the total period of plan participation necessary to the receipt of benefits." *426 222 N.J. Super. at 48, 535 A.2d 986. As applied in Whitfield, the wife's entitlement equaled X% of 16/20ths of the pension.
In Moore v. Moore, 114 N.J. 147, 156-57, 553 A.2d 20 (1989), the New Jersey Supreme Court expressly approved Whitfield's inclusion in the marital estate of retirement benefits which accrued after the parties separated. The Supreme Court stated:
In this case Mr. Moore's post-retirement cost-of-living increases were paid by the government and are unrelated to his future personal efforts. They are similarly unrelated to Mrs. Moore's future efforts. However, although these increases are not attributable to future efforts, they are attributable to past contributions and service. There would be no post-retirement cost-of-living increases without the latter. The portion of contributions and services to the plan made by Mr. Moore during the marriage relate to the joint efforts of both parties. Therefore, the segment of cost-of-living increases attributable to those contributions and services made during the marriage from the joint efforts of both parties are subject to equitable distribution.
114 N.J. at 157, 553 A.2d 20.
Although Moore and Whitfield make it clear that a non-employee spouse is entitled to share in retirement benefits which accrue to the employee spouse after the parties separated, there are no New Jersey cases which specifically address the allocation of a defined benefit plan similar to Mr. Marx's fixed income plan. Several cases from other jurisdictions do, however, and the court looks to them for guidance.
In Cooper v. Cooper, 167 Ariz. 482, 808 P.2d 1234 (Ariz. App. 1990), the Arizona Court of Appeals distinguished between a defined contribution plan and a defined benefit plan:
In a defined contribution plan, there is a specific amount of money assigned to the participant's account at any moment in time and the best estimate of present value is the amount currently credited the employee. [Citation omitted]. By contrast, in [defendant's] defined benefit plan, no account is kept for the employee. The present value must be determined according to the amount anticipated to be payable at normal retirement discounted by various factors to reflect risks inherent in awarding the money early. Such a calculation must include the inherent increases in credit value.
808 P.2d at 1241.
Mr. Cooper's defined benefit plan was similar to Mr. Marx's in that the employer was the sole contributor, there was an aggregate *427 account and the benefits to be paid on retirement were determined by a number of factors, including years of service. Mr. Cooper advanced the same argument as Mr. Marx: that the non-employee spouse should not benefit from contributions made by the employer after the parties separated. The court rejected that argument, noting: "[i]ncreases that ultimately determine the matured benefit are, until retirement or maturation date, simply unvested benefits, the right to which has been earned by the employee's spouse, here, partly during the marriage." Id.
Similarly, the California Court of Appeals held that a non-employee spouse was entitled to a share of her husband's defined benefit plan based upon the value of the benefits at the time of retirement. In re Marriage of Judd, 68 Cal. App.3d 515, 137 Cal. Rptr. 318 (1977). In Judd, the California court rejected the same argument as Mr. Marx's, stating:
Stanley strenuously argues that since annuity payments are also based upon earnings prior to retirement, Stanley's years of service after separation and divorce will possess a `significantly greater dollar value' than his years served during the marriage. Since Stanley's post-separation years will be his `most significant earning years,' it is urged that an award which gives equal weight to post-marital and pre-marital years of service is erroneous.
This argument has been rejected in In re Marriage of Freiberg, supra., 57 Cal. App.3d 304, 127 Cal. Rptr. 792. There, the Court recognized that husband and wife share the same qualitative interest in the husband's retirement rights ... and held that the fact that the plan of payment is reflective of an employee's subsequent salary increases cannot alter or diminish the stature of the community's [couple's] interest in those rights. [Citations omitted]. As counsel for Renee points out, an employee's contributions in the early years of employment during the marriage, even though based on a smaller salary, may actually be worth more than the contributions during the post-separation years, due to the longer period of accumulated interest and investment income prior to the commencement of benefit payments.
137 Cal. Rptr. at 321-22.
When Cooper and Judd are read in the context of New Jersey law, plaintiff is entitled to an equitable share of the entire defined benefit plan. Plaintiff's interest in the account cannot be determined as 50% of defendant's basic accumulation account, as plaintiff proposed, because that amount does not reflect the present value of the plan. Nor can defendant's proposed QDRO be *428 implemented because the Plan Administrator cannot calculate defendant's retirement benefits as of February 6, 1987. Plaintiff's equitable share of the defined benefit plan must be determined upon defendant's retirement, termination or death, when defendant's benefit will be calculated in accordance with the plan formula.
Accordingly, defendant's defined benefit plan shall be allocated as follows:
1. The total accrued benefit is to be determined when plaintiff is permitted to move her share of the benefit to pay status pursuant to the plan requirements.
2. The plan administrator is to determine the coverture fraction and multiply the total accrued benefit by the coverture fraction.
3. The product of the total accrued benefit times the coverture fraction is to be divided in half in accordance with plaintiff's equitable share.
Plaintiff's form of the qualified domestic relations order shall be entered.

COUNSEL FEES
In her motion, plaintiff sought counsel fees for the period of time since entry of the judgment of divorce during which defendant disputed the forms of QDROs. Rule 4:42-9(a)(1) provides for fees on any claim for enforcement of an interspousal agreement and N.J.S.A. 2A:34-23 provides for the award of counsel fees in matrimonial actions based upon the financial circumstances of the parties and the good or bad faith of either party.
Plaintiff argues that she has complied with every aspect of the agreement. Defendant, however, has persistently refused to cooperate in the entry of both QDROs for one and a half years. He refused to consent to entry of the variable income plan order even though he had no objection to plaintiff's proposed form of order.
*429 Plaintiff first submitted the proposed QDROs to defendant in July 1991. Defendant did not respond until December 1991. Plaintiff immediately replied to defendant setting forth the legal basis of her position. Defendant again delayed until May 27, 1992 before restating his objections without citing any authority. Plaintiff engaged an expert witness to support her position and demonstrate that defendant's proposal was technically incorrect and could not be utilized. Defendant still did not produce any expert witness of his own nor did he cite any legal authority for his position. Nevertheless, he required plaintiff to engage in protracted litigation on the issue. During the motion, defendant changed his position at least three times, in each instance advocating a position which differed from the proposed QDRO he submitted after oral argument.
Plaintiff's counsel has submitted an extensive and thorough certification of services indicating that he spent a total of 67.4 hours, roughly broken down into four categories: drafting and negotiation from 1/13/91 to 8/25/92; motion preparation, reply and argument from 10/5/92 to 10/16/92; post-argument submissions from 10/16/92 to 12/23/92; and conclusion of motion from 12/23/92 to 2/26/93. Of the 67.4 hours, 59.4 were billed at the rate of $200 per hour and 8 were billed at $110 per hour. Total fees were $12,760.
The briefs, certifications and exhibits submitted by plaintiff's counsel were well researched and supported by legal authority and expert opinion. All of this was made necessary by defendant's refusal to cooperate in entering the orders or to provide any legal or expert authority in support of his position.
The record indicates that defendant's income is far greater than plaintiff's and that plaintiff has substantially fewer resources available to her. Defendant's prolonging the litigation for almost 2 years without any expert or legal opinion to support his position warrants the imposition of counsel fees under the factors set forth in Williams v. Williams, 59 N.J. 229, 281 A.2d 273 (1971), and in *430 N.J.S.A. 2A:34-23. Accordingly, defendant shall pay $6,000 in counsel fees and $1,150 for Mr. Troyan's fees.
NOTES
[1] The coverture fraction has as its numerator the number of years during the marriage the employee-spouse participated in the plan and as its denominator the total number of years of the employee's service required for receipt of pay benefits. Whitfield v. Whitfield, 222 N.J. Super. 36, 48, 535 A.2d 986 (App. Div. 1987). The application of the coverture fraction is discussed infra.